## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MATTHEW MIRTO and JENNIFER MIRTO    :

    Plaintiffs,                  :       Case No.:  22cv672

v.

BAYER HEALTHCARE PHARMACEUTICALS, :
INC.; BAYER CORPORATION;            :
JOHNSON & JOHNSON SERVICES, INC.;   :
JANSSEN RESEARCH & DEVELOPMENT, LLC;:   May 17, 2022
And JANSSEN PHARMACEUTICAL COMPANY:

    Defendants

_____

## COMPLAINT

Plaintiffs Matthew Mirto and Jennifer Mirto sue Defendants Bayer Healthcare Pharmaceuticals, Inc., Bayer Corporation, (collectively referred to as the "Bayer Defendants"), Johnson & Johnson Services, Inc., Janssen Research & Development, LLC, Janssen Pharmaceutical Company (collectively referred to as the "J&J Defendants"), and states:

## INTRODUCTION

1.　　This is a product liability case that involves the prescription fluoroquinolone antibiotic drugs Cipro (ciprofloxacin), Avelox (moxifloxacin) and Levaquin (levofloxacin) (collectively referred to as "FLQ drugs").

2.　　Cipro is designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and/or sold by the Bayer Defendants.

3.　　Avelox is designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and/or sold by the Bayer Defendants

4.　　Levaquin is designed, developed, manufactured, tested, packaged, promoted,

marketed, advertised, distributed, labeled, and/or sold by the J&J Defendants.

5.      Plaintiffs maintain Cipro, Avelox and Levaquin are defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce to treat infections for which they were not required, and lacked proper warnings and directions as to the dangers associated with their all of their uses including the adverse health conditions associated with irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease.

## PARTIES

6.      At all material times, Mr. Mirto and Mrs. Mirto were married and resided together in Wallingford, Connecticut.

7.      By reason of Defendants' acts and omissions and as a direct and proximate result of being prescribed and ingesting Defendants' FLQ drugs, Mr. Mirto sustained personal injuries including irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease that resulted in an aortic aneurysm and dilated aortic root that destroyed his aortic valve requiring replacement and permanently damaging his heart function, physical pain and mental anguish, including diminished enjoyment of life, physical impairment, expenses for hospitalization and medical treatment, and loss of earnings, among other damages.

8.      Defendant Bayer HealthCare Pharmaceuticals, Inc. ("Bayer Healthcare") is a foreign for profit corporation with its principal place of business at 100 Bayer Boulevard, in Whippany, New Jersey 07981 and with a Connecticut Registered Agent to wit: Corporation Service Company, Goodwin Square 225 Asylum St., 29th Floor, Hartford, CT, 06103.

9.      In January 2008, Bayer Pharmaceuticals Corporation was merged into Bayer Healthcare and at all material times was involved in the labeling, supplying, selling, and distribution of pharmaceutical products, including Cipro and Avelox, throughout in the United

States and the State of Connecticut including Wallingford, Connecticut.

10.     Defendant Bayer Corporation ("Bayer Corp.") is foreign for profit corporation with its principal place of business at 100 Bayer Boulevard, in Whippany, New Jersey 07981 and with a Connecticut Registered Agent to wit: Corporation Service Company, Goodwin Square 225 Asylum St., 29th Floor, Hartford, CT, 06103.

11.     Bayer Corp., formerly known as Miles, Inc., is an American subsidiary of a German parent Bayer AG headquartered in Leverkusen, North Rhine-Westphalia, Germany who is one of the largest pharmaceutical companies in the world and the researcher, producer, and manufacturer of Cipro and Avelox, and was engaged in the business of testing, manufacturing, distributing, marketing, advertising, labeling, and selling Cipro in the United States.

12.      Upon information and belief, the Bayer Defendants did act together to design, sell, advertise, manufacture and/or distribute Cipro and Avelox with full knowledge of its dangerous and defective nature.

13.     Defendant Johnson & Johnson Services, Inc. ("J&J") is a foreign for-profit corporation with its principal place of business at One J&J Plaza, New Brunswick, New Jersey 08933 and with a Connecticut Registered Agent to wit: CT Corporation System, 67 Burnside Ave., East Hartford, CT, 06128-3408.

14.     J&J, and its "Family of Companies," is involved in the research, development, sales, and marketing of pharmaceutical products, including Levaquin.

15.     Defendant Janssen Research & Development, LLC ("Janssen R&D"), formerly known as Johnson & Johnson Pharmaceutical Research & Development, LLC, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 920 Route 202 South, P.O. Box 300, Mail Stop 2628, Raritan, New Jersey.

16.     At all times material hereto, Janssen R&D conducted research, development, and testing on Levaquin and is part of the J&J "Family of Companies."

17.     Defendant Janssen Pharmaceutical Company ("Janssen Pharma"), formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., is a foreign for profit corporation with its principal place of business at 1125 Trenton-Harbourton Rd., Titusville, New Jersey 08560.

18.     At all times material hereto, Janssen Pharma was the responsible U.S. entity for the design, manufacture, labeling, distribution, marketing, and sale of the drug Levaquin in the United States.

19.     Defendant Janssen Pharma is a wholly owned subsidiary of J&J.

20.     Upon information and belief, the J&J Defendants did act together to design, sell, advertise, manufacture and/or distribute Levaquin with full knowledge of its dangerous and defective nature.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiffs and Defendants.

22.     Defendants purposefully availed themselves of the privilege of conducting business activities within the State of Connecticut through the marketing, distribution, and sale of FLQ drugs, including to Mr. Mirto, thus invoking the benefits and protections of its laws.

23.     Defendants have significant contacts in the State of Connecticut such that they are subject to the personal jurisdiction of the court in this state.

24.     A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the District of Connecticut. Pursuant to 28 U.S.C. § 1391(a), venue is proper.

## **FACTUAL ALLEGATIONS**

25.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the FLQ drugs Cipro, Avelox, and Levaquin.

26.     The Bayer Defendants are a "product seller" engaged in the business of selling their FLQ drugs Cipro and Avelox as defined by CPLA, Conn. Gen. Stat. § 52-572m(a).

27.     The J&J Defendants are a "product seller" engaged in the business of selling their FLQ drug Levaquin as defined by CPLA, Conn. Gen. Stat. § 52-572m(a).

28.     FLQ drugs are broad-spectrum synthetic antibacterial agents marketed and sold in oral tablet, IV solution, and ophthalmic solution, used to treat certain bacterial infections. They are members of the quinolone class of antibiotics.

29.     Cipro was approved by the United States Food and Drug Administration ("FDA") in October 1987 for use in the United States and is the brand name for the antibiotic ciprofloxacin.

30.     Avelox was approved by the United States Food and Drug Administration ("FDA") in December 1999 for use in the United States and is the brand name for the antibiotic moxifloxacin.

31.     Levaquin was approved by the FDA on December 20, 1996, for use in the United States and is the brand name for the antibiotic levofloxacin.

32.     Cipro and Avelox have long been associated with serious side effects including but not limited to tendinopathy, aortic aneurysm, rupture, and dissection.

33.     Similar to Cipro, the scientific evidence has established a clear association between

Levaquin and an increased risk of tendinopathy, aortic aneurysm, rupture and dissection, no matter whether the FLQ drugs are stopped once symptoms develop or not.

34.    Prior to applying to the FDA for and obtaining approval of their FLQ drugs, Defendants knew or should have known that consumption of FLQ drugs were associated with and/or would cause chronic and/or permanent collagen toxicity, tendinopathy, and aortic disease including aneurysm, rupture, and dissection.

35.    Defendants failed to appropriately and adequately inform and warn Mr. Mirto and his prescribing physicians of the serious and dangerous risks associated with the use of FLQ drugs, as well as other severe and personal injuries that they cause, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, physical impairment, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

36.    The warning labels for Cipro from April 2006 to August 2008 misled and deceived Mr. Mirto and his treating physicians by incorrectly advising them the known side effects and/or injuries associated with Cipro were "rare" and could be avoided by discontinuing the drug upon the onset of certain symptoms. The truth, however, is that the onset of these symptoms and/or injuries is often rapid, and discontinuation of the drug will not ensure that the conditions are reversible. The Bayer Defendants misled patients (and physicians) by omitting any mention of the possibility that Cipro use could result in these conditions.

37.    The warning labels for Avelox from January 2007 through March 2007 misled and deceived Mr. Mirto and his treating physicians by incorrectly advising them the known side effects and/or injuries associated with Avelox were "rare" and could be avoided by discontinuing the drug upon the onset of certain symptoms. The truth, however, is that the onset of these symptoms and/or injuries is often rapid, and discontinuation of the drug will not ensure that the

conditions are reversible. The Bayer Defendants misled patients (and physicians) by omitting any mention of the possibility that Avelox use could result in these conditions.

38.     The warning labels for Levaquin from November 2003 through March 2015 misled and deceived Mr. Mirto and his treating physicians by incorrectly advising them the known side effects and/or injuries associated with Levaquin were "rare" and could be avoided by discontinuing the drug upon the onset of certain symptoms. The truth, however, is that the onset of these symptoms and/or injuries is often rapid, and discontinuation of the drug will not ensure that the conditions are reversible. The J&J Defendants misled patients (and physicians) by omitting any mention of the possibility that Levaquin use could result in these conditions.

39.     Further, Defendants failed to disclose the serious and dangerous side effects when promoting Cipro, Avelox and Levaquin to physicians and patients, despite the fact several studies conducted over a number of decades confirmed those side effects.

40.     The FDA first added a Black Box warning to FLQ drugs in July of 2008 for the increased risk of tendinitis and tendon rupture. In August of 2013, the FDA required updates to the labeling to describe the potential for irreversible peripheral neuropathy. In 2016 the FDA enhanced warnings about the association of FLQ drugs with disabling and potentially permanent side effects involving tendons, muscles, joints, nerves, and the central nervous system which included a statement that FLQ drugs should be reserved for use in patients who have no alternative treatment options. In December of 2018, the FDA issued a warning that FLQ drugs can increase the occurrence of serious events of ruptures or tears in aorta, aortic dissections, or ruptures of an aortic aneurysm, which can lead to dangerous bleeding or death.

41.     The Bayer Defendants and J&J Defendants each had a duty of care in disseminating product information extends to those patients, such as Mr. Mirto, who have been injured by generic

ingestion of any FLQ drugs as a result of prescriptions written in reliance on Defendants' product information for such drugs.

42.     Defendants knew or should have known that prescribing physicians would rely upon the warnings or product labeling disseminated by the Defendants for Cipro, Avelox and/or Levaquin in prescribing brand-name or generic ciprofloxacin, moxifloxacin, and/or levofloxacin for patients, such as Mr. Mirto.

43.     Mr. Mirto was prescribed FLQ drugs, including from physicians practicing in Connecticut and lawfully obtained the drugs from pharmacies in Connecticut.

44.     Specifically, Mr. Mirto was prescribed and took as directed the following FLQ drugs to treat suspected bacterial infections:

     a.  Cipro – twice: April 2006 and August 2008

     b.  Avelox – twice: January 2007 and March 2007

     c.  Levaquin: eight times: November 2003; December 2005; August 2008; February 2009; March 2009; July 2009; October 2009, and March 2015.

45.     In May 2004, Mr. Mirto began to experience pain in his tendons and connective tissues in several joints. After taking Levaquin in December 2005, he again experienced joint and connective tissue pain. In late 2009 and early 2010, he began to experience sever leg pains from his calf down to his feet. He was seen by rheumatologists, neurologists, and infectious disease specialists with normal findings. In 2016 and 2017, he had another neurology work-up for the ongoing leg pain. In April 2016, he was diagnosed with neurogenic pain. Otherwise, no definitive diagnosis and only normal findings that did not account for the pain in his feet and legs. Past history of Lyme disease did not account for the continued bilateral leg pain. The slightest force upon his legs caused pain and he would experience sudden onset of calf pain followed by a "pop"

and bruising throughout the calf that he noted to be worse after taking Levaquin. In late November 2017, he was thought to be allergic to Levaquin.

46.     Irreversible injuries suffered by Mr. Mirto include neurogenic pain, collagen toxicity and tendinopathy as a direct result of his use of Defendants' FLQ drugs.

47.     In November 2017, Mr. Mirto was referred to a cardiologist and an Echocardiogram was taken that found a dilated ascending aorta and dilated aortic root that was also confirmed by CT in January 2018.

48.     Thereafter, Mr. Mirto came under the care of cardio-thoracic specialists at Yale New Haven Hospital. On May 22, 2019, Mr. Mirto underwent cardio-thoracic surgery due to an expanding ascending aortic aneurysm and dilated aortic root and during surgical exploration found the aorta, root and valve were far more diseased than expected and that only something unusual could cause the extensive degree of harm given Mr. Mirto had no risk factors for such disease and genetic testing found no variants in his genes that were associated with his condition. As a result, the ascending aorta, aortic root, and valve had to be replaced.

49.     The aortic aneurysm and dilated aorta as well as the damage to Mr. Mirto's ascending aorta, root and valve are a direct result of his use of Defendants' FLQ drugs.

**APPLICATION AND TOLLING OF THE STATUTE OF LIMITATIONS**

50.     Mr. Mirto had no knowledge and in the exercise of reasonable care could not have discovered that the injuries to his ascending aorta, aortic root and valve were caused by Defendants' FLQ drugs until after the May 22, 2019 surgery.

51.     Mr. Mirto had no knowledge and in the exercise of reasonable care could not have discovered that neurogenic pain, collagen toxicity and tendinopathy injuries were caused by Defendants' FLQ drugs until after the May 22, 2019 surgery.

52.     The harm to Mr. Mirto by Defendants FLQ drugs occurred after taking the drugs and during the useful life of the drugs as prescribed.

53.     By Executive Order, Governor of Connecticut Ned Lamont suspended the running of the statute of limitations for civil claims during the time period from March 9, 2020 until March 21, 2021 due to the Covid-19 pandemic. See Executive Order 10A dated February 8, 2021. Accordingly, this additional time is added to the applicable running of the statute of limitations for Mr. Mirto's claims asserted herein.

54.     The running of any statute of limitations has also been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Mr. Mirto and his treating physicians the true risks associated with Defendants' FLQ drugs, including the actual incidence of FLQ-induced collagen toxicity, tendinopathy, neurogenic pain, and aortic aneurysms, the progressive and disabling nature of these injuries, and the irreversibility of these injuries.

55.     The time, place and substance of the Defendants' alleged fraud is set forth as follows. Between 1995 and 2002, FLQs became the most commonly prescribed class of antibiotics to adults in the United States. The explosive increase in FLQ prescriptions was a direct result of Defendants' deliberate decision to reframe FLQ drugs from a "big gun" antibiotic that should be reserved for serious infections to a "first choice" antibacterial that is appropriate for a wide range of mild infections.

56.     Beginning in at the late 1990s, Defendants aggressively marketed FLQ drugs while at the same time concealing, through misrepresentations or omissions, the risks associated with FLQ drugs. They did this by focusing on the incidence of relatively benign side effects, such as headaches or dizziness, while concealing the equally common but far more serious symptoms of

tendinopathy and damages to the aorta.

57.     As the J&J Defendants explained in their 2003 Levaquin brand plan: "In late 2000 through mid-2001, after extensive market research and segmentation analysis, the LEVAQUIN brand team made the decision to reposition LEVAQUIN from a 'big gun' anti-infective used in serious/recalcitrant infections, to a product that is effective in fighting more common infections where growth potential was the greatest…"[1] The Bayer Defendants likewise marketed Cipro for routine infections even though they knew that FLQs should be reserved for more serious conditions.

58.     One key obstacle to Defendants' re-branding scheme was their awareness of the nature and extent of collagen toxicity that manifest in tendinopathy and likely aortic aneurysm that could result from taking FLQ drugs. Defendants had long been on notice that FLQ drugs were associated with serious nerve and tendon injuries. For example, by the mid-1990s the J&J Defendants knew from their  own post-marketing experience that the most frequently reported adverse events concerned the central nervous system ("CNS"). The most common CNS adverse events were "dizziness, paresthesia and headache."

59.     Beginning in at the late 1990s, Defendants aggressively marketed FLQ drugs while at the same time concealing, through misrepresentations or omissions, the risk of peripheral neuropathy and collagen toxicity. They did this by focusing on the incidence of relatively benign side effects, such as headaches or dizziness, while concealing the equally common but far more

---

[1] See Linder, JA. et al. Fluoroquinolone prescribing in the United States: 1995 to 2002. *Am J Med.* 2005 Mar;118(3):259-68 ("Fluoroquinolone prescribing increased threefold in outpatient clinics and emergency departments in the United States from 1995 to 2002. Fluoroquinolones became the most commonly prescribed class of antibiotics to adults in 2002.").

serious symptoms of peripheral neuropathy and collagen toxicity.

60.     For more than a decade, Defendants have known that paresthesia and other symptoms associated with peripheral neuropathy and collagen toxicity in the form of tendinopathy were among the most common side effects of FLQ drugs, and more recently Defendants knew that FLQ significantly increase the occurrence of aortic aneurysms – yet they have fraudulently concealed these facts from the public, for years.

61.     In failing to update their labels and marketing materials, Defendants intended that that the misinformation contained in the label would be relied upon by Mr. Mirto and his prescribing physicians, which it was.

62.     As a direct result of Mr. Mirto and his prescribing physician's reliance on the false information contained within the FLQ drug labels, Mr. Mirto was prescribed and took Defendants' FLQ drugs and experienced collagen toxicity that manifest as tendinopathy and later as an ascending aortic aneurysm and dilated heart valve.

63.     The nature of Mr. Mirto's injuries and the relationship of such injuries to FLQ drugs were inherently undiscoverable prior to the full dissemination of the FDA disclosure of risk information that began in 2013 and most recently with respect to the risk of aortic dissection, in December 2018.

64.     Accordingly, the discovery rule should be applied to toll the running of the statute of limitations until Plaintiffs knew, or through reasonable care and diligence should have known, of his claims against Defendants, and in any event such tolling should continue until at least the date of FDA's disclosure of risk information in December 2018 and after Mr. Mirto's May 22, 2019 surgery when he first learned his aortic and valve disease were far worse than expected that could be due to his use of Defendants' FLQ drugs.

65.     Plaintiffs did not discover, and through the exercise of reasonable care and due diligence should not and could not have discovered, his illnesses and injuries or their relationship to the FLQ drugs until after the surgery on May 22, 2019, surgery. Plaintiff's suit is filed well within the applicable statute of limitations period under appropriate application of this state's "discovery rule."

66.     In the alternative, the facts of Mr. Mirto's claims made it impossible for him to discover the true nature of his injuries and/or causes of action within the applicable limitations period. In particular, Defendants' misrepresentations and omissions constituted active concealment regarding the true nature of the risks associated with their FLQ drugs prevented Mr. Mirto from discovering the wrongful acts on which their causes of action are based.

## COUNT I – PRODUCT LIABILITY AGAINST BAYER DEFENDANTS

### (CPLA, Conn. Gen. Stat §§ 52-572m, et seq.)

67.     Mr. Mirto re-alleges all prior allegations of the Complaint, except paragraphs 13 through 20 and 27, as if set out here in full.

68.     The Bayer Defendants are product sellers and liable to Plaintiff under the CPLA, Conn. Gen. Stat. § 52-572m *et seq*. for failure to provide adequate warnings to Mr. Mirto and his physicians about the risks associated with taking FLQ drugs Cipro/Avelox and for placing an unreasonably dangerous product into the stream of commerce including claims for product liability for: strict liability in tort; negligence, breach of warranty, express or implied; breach of failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent.

### Strict Liability in Tort

69.     The FLQ drugs Cipro/Avelox manufactured, marketed, supplied and/or distributed

by the Bayer Defendants were defective at the time of manufacture, development, production, testing, inspection, endorsement, prescription, sale and distribution in that warnings, instructions and directions accompanying such labels failed to warn of the dangerous risks they posed, including the risk of developing irreversible peripheral neuropathy, collagen toxicity, tendinopathy, and aortic disease.

70.    At all times alleged herein, the drugs Cipro/Avelox manufactured, marketed, supplied, and/or distributed by the Bayer Defendants were defective.

71.    The Bayer Defendants knew their drugs Cipro/Avelox would be used by consumers without inspection for defects.

72.    Moreover, Mr. Mirto, his prescribing physicians neither knew nor had reason to know at the time of his use of the drugs Cipro/Avelox of the aforementioned defects. Ordinary consumers would not have recognized the potential risks for which Defendants failed to include the appropriate warnings.

73.    At all times alleged herein, the Bayer Defendants' drugs Cipro/Avelox were prescribed to and used by Mr. Mirto as intended by the Bayer Defendants and in a manner reasonably foreseeable to them.

74.    The design of Bayer Defendants' FLQ drugs Cipro/Avelox were defective in that the risks associated with using the drugs as a first-line therapy for infections that did not dictate the use of a FLQ drug outweighed any benefits of their design. Any benefits associated with the use of the FLQ drugs in such situations were either relatively minor or nonexistent and could have been obtained by the use of other, alternative treatments and products that could equally or more effectively reach similar results but without the increased risk of developing irreversible injuries such as those suffered by Mr. Mirto.

75.     The defect in design existed when the drugs Cipro/Avelox left the Bayer Defendants' possession.

76.     At the time the Cipro/Avelox drugs left the control of the Bayer Defendants, they knew or should have known of the risks associated with ingesting such drugs.

**Negligence**

77.     At all times material hereto, the Bayer Defendants had a duty to exercise reasonable care to consumers, including Mr. Mirto, in the design, development, manufacture, testing, inspection, packaging, promotion, marketing, distribution, labeling, and/or sale of the FLQ drugs Cipro/Avelox.

78.     The Bayer Defendants breached their duty of reasonable care to Mr. Mirto in that they negligently promoted, marketed, distributed, and/or labeled the drugs Cipro/Avelox.

79.     Mr. Mirto's injuries and damages alleged herein were and are the direct and proximate result of the carelessness and negligence of the Bayer Defendants, including, but not limited to, one or more of the following particulars:

    a.      In the design, development, research, manufacture, testing, packaging, promotion, marketing, sale, and/or distribution of Defendants' FLQ drugs Cipro/Avelox;

    b.      In failing to warn or instruct, and/or adequately warn or adequately instruct, users of the subject product, including Mr. Mirto herein, of the dangerous and defective characteristics of Cipro/Avelox;

    c.      In the design, development, implementation, administration, supervision, and/or monitoring of clinical trials for Cipro/Avelox;

    d.      In promoting Cipro/Avelox in an overly aggressive, deceitful, and fraudulent manner, including as a first-line therapy to treat infections for which they were

not required despite evidence as to the drug's defective and dangerous characteristics due to its propensity to cause irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects;

e.      In representing that Cipro/Avelox were safe for the intended use when, in fact, the drugs were unsafe for their intended use;

f.      Failure to perform appropriate pre-market testing of Cipro/Avelox;

g.      Failure to perform appropriate post-market surveillance of Cipro/Avelox;

h.      Failure to adequately and properly test Cipro/Avelox before and after placing it on the market;

i.      Failure to conduct sufficient testing on Cipro/Avelox which, if properly performed, would have shown that it had the serious side effects;

j.      Failure to adequately warn Mr. Mirto and his healthcare providers that the use of Cipro/Avelox carried a risk of developing irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects;

k.      Failure to provide adequate post-marketing warnings or instructions after the Bayer Defendants knew or should have known of the significant risk of severe side effects associated with the use of Cipro/Avelox; and

l.      Failure to adequately and timely inform Mr. Mirto and the healthcare industry of the risk of serious personal injury, from Cipro/Avelox ingestion as described herein.

80.    The Bayer Defendants knew or should have known that consumers, such as Mr. Mirto, would foreseeably suffer injury as a result of Defendants' failure to exercise reasonable and ordinary care.

16

**Breach Of Express Warranty**

81.    Before Mr. Mirto was first prescribed the Bayer Defendants' FLQ drugs Cipro/Avelox and during the period in which he used it, said Defendants expressly warranted Cipro/Avelox were safe.

82.    The Bayer Defendants' FLQ drugs Cipro/Avelox did not conform to these express representations because it was not safe and had an increased risk of serious side effects, whether taken individually or in conjunction with other therapies.

83.    Mr. Mirto, individually and through his prescribing physicians, reasonably relied upon the express warranty of the Bayer Defendants.

84.    Mr. Mirto was prescribed, purchased, and used Cipro/Avelox for their intended purpose.

85.    The Bayer Defendants breached their express warranty associated with Cipro/Avelox.

**Breach Of Implied Warranty**

86.    At all times mentioned herein, the Bayer Defendants manufactured, compounded, packaged, distributed, recommended, merchandised, advertised, promoted, supplied, and/or sold their FLQ drugs Cipro/Avelox.

87.    Before Cipro/Avelox were prescribed to Mr. Mirto, the Bayer Defendants impliedly warranted to Mr. Mirto that these drugs were of merchantable quality and safe and fit for the intended use.

88.    Mr. Mirto, individually and through his prescribing physicians, reasonably relied upon the skill, superior knowledge, and judgment of the Bayer Defendants.

89.    Mr. Mirto was prescribed, purchased, and used Cipro/Avelox for their intended

purpose.

90.     Due to the Bayer Defendants' wrongful conduct as alleged herein, Mr. Mirto could not have known about the nature of the risks and side effects associated with the subject products until after he used them.

91.     Contrary to the implied warranty for the subject products, Defendants' FLQ drugs Cipro/Avelox were not of merchantable quality, and neither safe nor fit for its intended use and purpose, as alleged herein.

**Failure To Discharge a Duty To Warn or Instruct Whether Negligent or Innocent**

92.     The Bayer Defendants, having undertaken to prepare, design, research, develop, manufacture, inspect, label, market, promote, and sell their FLQ drugs Cipro/Avelox, owed a duty to provide accurate and complete information regarding this drug.

93.     The Bayer Defendants' advertising, marketing, and educational programs, by containing affirmative misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of Cipro/Avelox were safe for human use, had no unacceptable side effects, and would not interfere with daily life.

94.     The Bayer Defendants did not properly study nor report accurately the results of their studies in terms of risks and benefits of Cipro/Avelox.

95.     The Bayer Defendants purposefully concealed, failed to disclose, misstated, downplayed, and understated the health hazards and risks associated with the use of Cipro/Avelox.

96.     The Bayer Defendants used and relied on inaccurate and flawed scientific papers to defend and justify the marketing, promotions, and labeling of Cipro/Avelox. At all times, Defendants knew that what they were publishing or having published was inaccurate and that this information would mislead members of the medical and scientific communities who were

studying, or more importantly, prescribing FLQ drugs such as Cipro/Avelox.

97.     Thus, the Bayer Defendants, through the publication of medical literature, deceived potential users and prescribers of FLQ drugs Cipro/Avelox by relaying only allegedly positive information, while concealing, misstating, and downplaying the known adverse and serious health effects, including irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects.

98.     The Bayer Defendants similarly used promotional practices to deceive potential users and prescribers of Cipro/Avelox by relaying only allegedly positive information, while concealing, misstating, and downplaying the known adverse and serious health effects, including irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects.

99.     The Bayer Defendants also falsely and deceptively kept relevant information from potential Cipro users and minimized prescriber concerns regarding the safety and efficacy of FLQ drugs.

100.     The scientific and medical communities were misled as to the true nature of the risk and benefits of the Defendants' FLQ drugs Cipro/Avelox in particular and in general as to the treatment needs and options for patients in need of antibiotic therapy. It was not until the FLQ label change in August 2013 regarding the rapid onset and potentially permanent nature of neuropathies and in December 2018 regarding aortic disease that the truth began to be generally available in the scientific community. Even then, however, patients and physicians had been so conditioned by the false science published and/or funded for years by said Defendants that it was difficult for many of them to accept the truth about the risks and lack of benefits associated with these FLQ drugs.

101.    The misconceptions as to the true risks and benefits of Defendants' FLQ drugs Cipro/Avelox were pervasive throughout the medical and scientific communities due to the marketing methods employed by said Defendants that included the following:

   a.   The publication of inaccurate and flawed papers in scientific and medical literature;

   b.   Providing false and misleading information to doctors during sales and detailing calls at the doctors' offices or at medical or scientific conferences and meetings;

   c.   Funding and sponsoring physicians, consultants and/or Key Opinion Leaders to disseminate false and misleading scientific and medical information through medical journals and publications;

   d.   Funding third-party companies to disseminate false and misleading scientific and medical information through its publications and its members to physicians and patients;

   e.   Funding continuing medical education to disseminate false and misleading information to doctors;

   f.   Paying specialists in the field to meet with prescribing doctors for the purpose of disseminating false and misleading information about the risks and benefits of the FLQ drugs; and

   g.   Disseminating direct to consumers advertising to drive patients to their doctors' offices to ask for their FLQ drugs based on false and misleading information regarding the risks and benefits of the drugs.

102.    In particular, the Bayer Defendants falsely and deceptively misrepresented material facts regarding the safety and effectiveness of Cipro/Avelox and fraudulently, intentionally, and/or negligently concealed material information, including adverse information, regarding the safety

and effectiveness of their products, including by concealing the following information:

    a.  That there was evidence of peripheral paresthesia associated with FLQ therapy as early as 1988;

    b.  That there was evidence demonstrating that FLQ drugs increase the risk of irreversible peripheral neuropathy as early as 1996;

    c.  That it was known in the mid-1990s that cases of paresthesia were one of the three "most frequently reported AEs" related to the central nervous system.

    d.  That FLQ drugs were not fully and adequately tested by said Defendants and/or their predecessor for the risk of developing irreversible peripheral neuropathy and collagen toxicity;

    e.  The severity, frequency, rapid onset, and potentially disabling nature of peripheral neuropathy and collagen toxicity caused by FLQ drugs;

    f.  The wide range of injuries caused by FLQ drugs to multiple body systems (e.g., musculoskeletal, neuropsychiatric, peripheral nervous system, senses like vision or hearing, skin, and cardiovascular) and aortic disease;

    g.  FLQ drugs increased the occurrence of serious events of ruptures or tears in the main artery of the body, called the aorta; that these tears or dissections, or ruptures on an aortic aneurysm can lead to dangerous bleeding or dearth;

    h.  The severity, frequency, rapid onset, and potentially disabling nature of collagen toxicity was known to be caused by FLQ drugs and should have been known to increase the risk of aortic disease, including aneurysm and dissection; and

    i.  That FLQ drugs should not be used as a first-line therapy to treat infections for which they are not required.

103.    The misrepresentations and/or active concealments were perpetuated directly and/or indirectly by the Bayer Defendants. Moreover, as a result of these efforts it was accepted by the medical and scientific communities that FLQ drugs, including Cipro/Avelox, had a certain risk benefit profile that was shown to be completely false by independent studies, case series, and reports to the FDA.

104.    The Bayer Defendants were in possession of evidence demonstrating that FLQ drugs, including Cipro/Avelox, caused serious and sometimes debilitating side effects. Nevertheless, Defendants continued to market such products by providing false and misleading information with regard to its safety and efficacy to Mr. Mirto and his treating physicians.

105.    The Bayer Defendants knew or should have known that these representations were false, and they made the representations with the intent or purpose of deceiving Mr. Mirto, their prescribing physicians, and the healthcare industry generally.

106.    The Bayer Defendants made these false representations with the intent or purpose that Mr. Mirto, their prescribing physicians, and the healthcare industry would rely on them, leading to the widespread use of Cipro/Avelox by Mr. Mirto, as well as the general public.

107.    At all times herein mentioned, neither Mr. Mirto nor his physicians were aware of the falsity or incompleteness of the statements being made by Defendants and believed them to be true. Had they been aware of these facts, Mr. Mirto's physicians would not have prescribed, and Mr. Mirto would not have taken these FLQ drugs.

108.    Mr. Mirto, his prescribing physicians, and the healthcare industry justifiably relied on and/or were induced by the Bayer Defendants' misrepresentations and/or active concealment and relied on the absence of information regarding the dangers of FLQ drugs Cipro/Avelox that said Defendants did suppress, conceal, or fail to disclose to Mr. Mirto's detriment. Mr. Mirto

justifiably relied, directly or indirectly, on said Defendants' misrepresentations and/or active concealment regarding the true dangers of the FLQ drugs Cipro/Avelox.

109.    Based on the nature of the physician-patient relationship, said Defendants had reason to expect that Mr. Mirto would indirectly rely on Defendants' misrepresentations and/or active concealment.

110.    Mr. Mirto reasonable relied upon the Bayer Defendants representations and took the Cipro/Avelox medications as prescribed by his treating physicians.

**Misrepresentation or Nondisclosure, Whether Negligent or Innocent**

111.    The Bayer Defendants negligently and/or recklessly misrepresented to Mr. Mirto, his prescribing physicians, and the healthcare industry the safety and effectiveness of the FLQ drugs Cipro/Avelox, and/or recklessly and/or negligently concealed material information, including adverse information, regarding the safety, effectiveness, and dangers posed by such drugs.

112.    The Bayer Defendants made reckless or negligent misrepresentations and negligently or recklessly concealed adverse information when they knew, or should have known, that FLQ drugs Cipro/Avelox, had defects, dangers, and characteristics that were other than what said Defendants had represented to Mr. Mirto, his physicians, and the healthcare industry generally. Specifically, said Defendants negligently or recklessly concealed from Mr. Mirto, their prescribing physicians, the health care industry, and the consuming public that:

      a.   Evidence (e.g., Karlman, et al.) of peripheral paresthesia associated with FLQ therapy (ciprofloxacin) was known as early as 1988;

      b.   Evidence (e.g., Hedenmalm, et al.) demonstrating that FLQ drugs increase the risk of irreversible peripheral neuropathy was known as early as 1996;

c. It was known in the mid-1990s that cases of paresthesia were one of the three "most frequently reported AEs" related to the central nervous system.

d. FLQ drugs were not fully and adequately tested by Defendants and/or their predecessor for the risk of developing irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects;

e. The severity, frequency, rapid onset, and potentially disabling nature of irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects were known to be caused by FLQ drugs;

f. The wide range of injuries caused by FLQ drugs to multiple body systems (e.g., musculoskeletal, neuropsychiatric, peripheral nervous system, senses like vision or hearing, skin, and cardiovascular) and aortic disease;

g. FLQ drugs increased the occurrence of serious events of ruptures or tears in the main artery of the body, called the aorta; that these tears or dissections, or ruptures on an aortic aneurysm can lead to dangerous bleeding or dearth;

h. The severity, frequency, rapid onset, and potentially disabling nature of collagen toxicity was known to be caused by FLQ drugs and should have been known to increase the risk of aortic disease, including aneurysm and dissection; and

i. That FLQ drugs should not be used as a first-line therapy for minor or uncomplicated infections.

113. The negligent or reckless misrepresentations and/or negligent or reckless failures to disclose were perpetuated directly and/or indirectly by the Bayer Defendants.

114. The Bayer Defendants should have known through the exercise of due care that these representations were false, and they made the representations without the exercise of due

care leading to the deception of Mr. Mirto, their prescribing physicians, and the healthcare industry.

115.    The Bayer Defendants made these false representations without the exercise of due care knowing that it was reasonable and foreseeable that Mr. Mirto, his prescribing physicians, and the healthcare industry would rely on them, leading to the use of Cipro/Avelox by Mr. Mirto as well as the general public.

116.    At all times herein mentioned, neither Mr. Mirto nor his physicians were aware of the falsity or incompleteness of the statements being made by the Bayer Defendants and believed them to be true. Had Mr. Mirto been aware of said facts, his physicians would not have prescribed, and he would not have taken Cipro/Avelox.

117.    Mr. Mirto justifiably relied on and/or was induced by the Bayer Defendants' negligent or reckless misrepresentations and/or negligent or reckless failure to disclose the dangers of Cipro/Avelox and relied on the absence of information regarding the dangers of this drug which said Defendants negligently or recklessly suppressed, concealed, or failed to disclose to Mr. Mirto's detriment.

118.    The Bayer Defendants had a post-sale duty to warn Mr. Mirto, his prescribing physicians, and the general public about the potential risks and complications associated with Cipro/Avelox in a timely manner.

119.    The Bayer Defendants made the representations and actively concealed information about the defects and dangers of Cipro/Avelox with the absence of due care such that Mr. Mirto's prescribing physicians and the consuming public would rely on such information, or the absence of information, in selecting these drugs for treatment.

120.    As a result of the negligent or reckless concealment and/or the negligent or reckless

failure to provide materials facts as set forth above, Mr. Mirto ingested Cipro/Avelox.

**Causation and Damages**

121.    As a direct and proximate result of the Bayer Defendants' breech of the foregoing product liability claims, Mr. Mirto suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money. The losses are either permanent or continuing and Mr. Mirto will suffer the losses in the future.

WHEREFORE, Mr. Mirto demands judgment for damages against the Bayer Defendants, plus interest, costs, and any other relief this Court deems just and appropriate.

**COUNT II – FRAUDULENT CONCEALMENT AGAINST BAYER DEFENDANTS**

122.    Mr. Mirto re-alleges all prior paragraphs of the Complaint, except paragraphs 12 through 20, as if fully set forth herein.

123.    The Bayer Defendants concealed their wrongful conduct from the Mr. Mirto with the intent that Mr. Mirto and his prescribing physicians would rely on such material representations as follows:

 a.  Defendants had actual knowledge of the defective and dangerous nature of FLQ drugs Cipro/Avelox;

 b.  Defendants failed to conduct adequate testing on their FLQ drugs to establish safety and efficacy.

 c.  Defendants had actual knowledge of their misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct.

Yet, said Defendants continued to perpetuate their wrongful conduct with the intent and fixed purpose of concealing their wrongs from Mr. Mirto and the public at large.

124.    Mr. Mirto and his prescribing physicians were unaware of the falsity of these representations, they acted in actual and justifiable reliance on such material misrepresentations, and Mr. Mirto was injured as a direct and proximate result.

125.    Additionally, the Bayer Defendants knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Mr. Mirto, his prescribing physicians, and the general public of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Mr. Mirto and his prescribing physicians would rely on Defendants' misrepresentations.

126.    Mr. Mirto and his prescribing physicians did in fact, act in actual and justifiable reliance on the Bayer Defendants' representations.

127.    The Bayer Defendants, as the manufacturer and/or distributor of their FLQ drugs Cipro/Avelox, was in a position of superior knowledge and judgment regarding any potential risks associated with their drug.

128.    Defendants committed constructive fraud by breaching one or more legal or equitable duties owed to Mr. Mirto relating to their FLQ drugs Cipro/Avelox, said breach or breaches constituting fraud because of its propensity to deceive others or constitute an injury to public interests or public policy.

129.    In breaching their duties to Mr. Mirto, the Bayer Defendants used their position of trust as the manufacturer and/or distributor of FLQ drugs Cipro/Avelox to increase sales said drugs at the expense of informing Mr. Mirto that, by ingesting these drugs, he and the general

public were placing themselves at a significantly-increased risk of developing irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects.

130.    As a direct and proximate result of the Bayer Defendants' fraudulent concealment, Mr. Mirto suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money. The losses are either permanent or continuing and Mr. Mirto will suffer the losses in the future.

WHEREFORE, Mr. Mirto demands judgment for damages against the Bayer Defendants, plus interest, costs, and any other relief this Court deems just and appropriate.

### COUNT III – LOSS OF CONSORTIUM AGAINST BAYER DEFENDANTS

131.    Mrs. Mirto re-alleges all prior paragraphs of the Complaint, except paragraphs 12 through 20, as if fully set forth herein.

132.    As a direct and proximate result of the Bayer Defendants' negligence as set forth above, Mrs. Mirto lost the society, services, care, comfort, and consortium of her husband. The losses are either permanent or are continuing in nature and Mrs. Mirto will suffer the losses and impairment in the future.

WHEREFORE, Mrs. Mirto demands judgment for damages against the Bayer Defendants, plus interest, costs, and any other relief this Court deems just and appropriate.

### COUNT IV – PRODUCT LIABILITY AGAINST J&J DEFENDANTS
### (CPLA,Conn. Gen. Stat §§ 52-572m, et seq.)

133.    Mr. Mirto re-alleges all prior allegations of paragraphs 1, 4 through 7, 13 through 64 except 26, as if fully set forth herein.

134.    The J&J Defendants are product sellers and liable to Plaintiff under the CPLA,

Conn. Gen. Stat. § 52-572m *et seq*. for failure to provide adequate warnings to Mr. Mirto and his physicians about the risks associated with taking FLQ drug Levaquin and for placing an unreasonably dangerous product into the stream of commerce including claims for product liability for: strict liability in tort; negligence, breach of warranty, express or implied; breach of failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent.

### Strict Liability in Tort

135.    The FLQ drug Levaquin manufactured, marketed, supplied and/or distributed by J&J Defendants was defective at the time of manufacture, development, production, testing, inspection, endorsement, prescription, sale and distribution in that warnings,  instructions  and directions accompanying such labels failed to warn of the dangerous risks they posed, including the risk of developing irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease.

136.    At all times alleged herein, the drug Levaquin manufactured, marketed, supplied, and/or distributed by the J&J Defendants was defective

137.    The J&J Defendants knew their Levaquin drug would be used by consumers without inspection for defects.

138.    Moreover, Mr. Mirto, his prescribing physicians neither knew nor had reason to know at the time of his use of the drugs of the aforementioned defects. Ordinary consumers would not have recognized the potential risks for which Defendants failed to include the appropriate warnings.

139.    At all times alleged herein, the J&J Defendants' FLQ drug Levaquin was prescribed to and used by Mr. Mirto as intended by the said Defendants and in a manner reasonably

foreseeable to them.

140.    The design of J&J Defendants' FLQ drug Levaquin was defective in that the risks associated with using the drugs as a first-line therapy for infections that did not dictate the use of an FLQ outweighed any benefits of their design. Any benefits associated with the use of the FLQ drugs in such situations were either relatively minor or nonexistent and could have been obtained by the use of other, alternative treatments and products that could equally or more effectively reach similar results but without the increased risk of developing irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease such as those suffered by Mr. Mirto.

141.    The defect in design existed when the drugs left the J&J Defendants' possession.

142.    At the time the Levaquin drugs left the control of the J&J Defendants, they knew or should have known of the risks associated with ingesting such drug.

**Negligence**

143.    At all times material hereto, the J&J Defendants had a duty to exercise reasonable care to consumers, including Mr. Mirto, in the design, development, manufacture, testing, inspection, packaging, promotion, marketing, distribution, labeling, and/or sale of the FLQ  drug Levaquin.

144.    The J&J Defendants breached their duty of reasonable care to Mr. Mirto in that they negligently promoted, marketed, distributed, and/or labeled the drugs.

145.    Mr. Mirto's injuries and damages alleged herein were and are the direct and proximate result of the carelessness and negligence of the J&J Defendants, including, but not limited to, one or more of the following particulars:

    a.        In the design, development, research, manufacture, testing, packaging, promotion, marketing, sale, and/or distribution of Defendants' FLQ drug Levaquin;

b.      In failing to warn or instruct, and/or adequately warn or adequately instruct, users of the subject product, including Mr. Mirto herein, of the dangerous and defective characteristics of Levaquin;

c.      In the design, development, implementation, administration, supervision, and/or monitoring of clinical trials for Levaquin;

d.      In promoting Levaquin in an overly aggressive, deceitful, and fraudulent manner, including as a first-line therapy to treat infections for which they were not required despite evidence as to the drug's defective and dangerous characteristics due to its propensity to cause irreversible neurogenic pain, collagen toxicity, tendinopathy, aortic disease, and other severe side effects;

e.      In representing that Levaquin was safe for the intended use when, in fact, the drug was unsafe for its intended use;

f.      Failure to perform appropriate pre-market testing of Levaquin;

g.      Failure to perform appropriate post-market surveillance of Levaquin;

h.      Failure to adequately and properly test Levaquin before and after placing it on the market;

i.      Failure to conduct sufficient testing on Levaquin which, if properly performed, would have shown that it had the serious side effects;

j.      Failure to adequately warn Mr. Mirto and his healthcare providers that the use of Levaquin carried a risk of developing aortic dissection and irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects;

k.      Failure to provide adequate post-marketing warnings or instructions after

the J&J Defendants knew or should have known of the significant risk of severe side effects associated with the use of Levaquin; and

l.      Failure to adequately and timely inform Mr. Mirto and the healthcare industry of the risk of serious personal injury, from Levaquin ingestion as described herein.

146.    The J&J Defendants knew or should have known that consumers, such as Mr. Mirto, would foreseeably suffer injury as a result of Defendants' failure to exercise reasonable and ordinary care.

### Breach Of Express Warranty

147.    Before Mr. Mirto was first prescribed the J&J Defendants' FLQ drug Levaquin and during the period in which he used it, said Defendants expressly warranted Levaquin was safe.

148.    The J&J Defendants' FLQ drug Levaquin did not conform to these express representations because it was not safe and had an increased risk of serious side effects, whether taken individually or in conjunction with other therapies.

149.    Mr. Mirto, individually and through his prescribing physicians, reasonably relied upon the express warranty of the J&J Defendants.

150.    Mr. Mirto was prescribed, purchased, and used Levaquin for its intended purpose.

151.    The J&J Defendants breached their express warranty associated with Levaquin.

### Breach Of Implied Warranty

152.    At all times mentioned herein, the J&J Defendants manufactured, compounded, packaged, distributed, recommended, merchandised, advertised, promoted, supplied, and/or sold their FLQ drug Levaquin.

153.    Before Levaquin was prescribed to Mr. Mirto, the J&J Defendants impliedly warranted to Mr. Mirto that this drug was of merchantable quality and safe and fit for the use for

it was intended.

154.    Mr. Mirto, individually and through his prescribing physicians, reasonably relied upon the skill, superior knowledge, and judgment of the J&J Defendants.

155.    Mr. Mirto was prescribed, purchased, and used Levaquin for its intended purpose.

156.    Due to the J&J Defendants' wrongful conduct as alleged herein, Mr. Mirto could not have known about the nature of the risks and side effects associated with the subject drug until after he used them.

157.    Contrary to the implied warranty for the subject products, Defendants' FLQ drug Levaquin was not of merchantable quality, and neither safe nor fit for its intended use and purpose, as alleged herein.

**Failure To Discharge a Duty To Warn or Instruct Whether Negligent or Innocent**

158.    The J&J Defendants, having undertaken to prepare, design, research, develop, manufacture, inspect, label, market, promote, and sell their FLQ drug Levaquin, owed a duty to provide accurate and complete information regarding this drug.

159.    The J&J Defendants' advertising, marketing, and educational programs, by containing affirmative misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of Levaquin was safe for human use, had no unacceptable side effects, and would not interfere with daily life.

160.    The J&J Defendants did not properly study nor report accurately the results of their studies in terms of risks and benefits of Levaquin.

161.    The J&J Defendants purposefully concealed, failed to disclose, misstated, downplayed, and understated the health hazards and risks associated with the use of Levaquin. For instance, the J&J Defendants hired physicians, scientists, and medical communications companies

to write inaccurate and misleading scientific articles for the purpose of creating confusion so as to pollute existing scientific and medical knowledge pertaining to the risk of developing permanent peripheral neuropathy with FLQ drug use.

162.    The J&J Defendants used and relied on inaccurate and flawed scientific papers to defend and justify the marketing, promotions, and labeling of Levaquin. At all times, Defendants knew that what they were publishing or having published was inaccurate and that this information would mislead members of the medical and scientific communities who were studying, or more importantly, prescribing FLQ drugs such as Levaquin.

163.    Thus, the J&J Defendants, through the publication of medical literature, deceived potential users and prescribers of FLQ drug Levaquin by relaying only allegedly positive information, while concealing, misstating, and downplaying the known adverse and serious health effects, including irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects.

164.    The J&J Defendants similarly used promotional practices to deceive potential users and prescribers of Levaquin by relaying only allegedly positive information, while concealing, misstating, and downplaying the known adverse and serious health effects, including irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects.

165.    The J&J Defendants also falsely and deceptively kept relevant information from potential Levaquin users and minimized prescriber concerns regarding the safety and efficacy of FLQ drugs.

166.    The scientific and medical communities were misled as to the true nature of the risk and benefits of the Defendants' FLQ drug Levaquin in particular and in general as to the treatment needs and options for patients in need of antibiotic therapy. It was not until the FLQ label change

in August 2013 regarding the rapid onset and potentially permanent nature of neuropathies and in December 2018 regarding aortic disease that the truth began to be generally available in the scientific community. Even then, however, patients and physicians had been so conditioned by the false science published and/or funded for years by said Defendants that it was difficult for many of them to accept the truth about the risks and lack of benefits associated with these FLQ drugs.

167.   The misconceptions as to the true risks and benefits of Defendants' FLQ drug Levaquin were pervasive throughout the medical and scientific communities due to the marketing methods employed by said Defendants that included the following:

  a.   The publication of inaccurate and flawed papers in scientific and medical literature;

  b.   Providing false and misleading information to doctors during sales and detailing calls at the doctors' offices or at medical or scientific conferences and meetings;

  c.   Funding and sponsoring physicians, consultants and/or Key Opinion Leaders to disseminate false and misleading scientific and medical information through medical journals and publications;

  d.   Funding third-party companies to disseminate false and misleading scientific and medical information through its publications and its members to physicians and patients;

  e.   Funding continuing medical education to disseminate false and misleading information to doctors;

  f.   Paying specialists in the field to meet with prescribing doctors for the purpose of disseminating false and misleading information about the risks and benefits of the FLQ drugs; and

  g.   Disseminating direct to consumers advertising to drive patients to their doctors'

offices to ask for their FLQ drugs based on false and misleading information regarding the risks and benefits of the drugs.

168.    In particular, the J&J Defendants falsely and deceptively misrepresented material facts regarding the safety and effectiveness of Levaquin and fraudulently, intentionally, and/or negligently concealed material information, including adverse information, regarding the safety and effectiveness of their products, including by concealing the following information:

   a.   That there was evidence of peripheral paresthesia associated with FLQ drug therapy as early as 1988;

   b.   That there was evidence demonstrating that FLQ drugs increase the risk of irreversible peripheral neuropathy as early as 1996;

   c.   That it was known in the mid-1990s that cases of paresthesia were one of the three "most frequently reported AEs" related to the central nervous system.

   d.   That FLQ drugs were not fully and adequately tested by said Defendants and/or their predecessor for the risk of developing irreversible peripheral neuropathy;

   e.   The severity, frequency, rapid onset, and potentially disabling nature of peripheral neuropathy caused by FLQ drugs;

   f.   The wide range of injuries caused by FLQ drugs to multiple body systems (e.g., musculoskeletal, neuropsychiatric, peripheral nervous system, senses like vision or hearing, skin, and cardiovascular) and the aortic disease;

   g.   FLQ drugs increased the occurrence of serious events of ruptures or tears in the main artery of the body, called the aorta; that these tears or dissections, or ruptures on an aortic aneurysm can lead to dangerous bleeding or dearth;

   h.   The severity, frequency, rapid onset, and potentially disabling nature of collagen

toxicity was known to be caused by FLQ drugs and should have been known to increase the risk of aortic disease, including aneurysm and dissection; and

i. That FLQ drugs should not be used as a first-line therapy to treat infections for which they are not required.

169. The misrepresentations and/or active concealments were perpetuated directly and/or indirectly by the J&J Defendants. Moreover, as a result of these efforts it was accepted by the medical and scientific communities that FLQ drugs, including Levaquin, had a certain risk benefit profile that was shown to be completely false by independent studies, case series, and reports to the FDA.

170. The J&J Defendants were in possession of evidence demonstrating that FLQ drugs, including Levaquin, caused serious and sometimes debilitating side effects. Nevertheless, Defendants continued to market such products by providing false and misleading information with regard to its safety and efficacy to Mr. Mirto and his treating physicians.

171. The J&J Defendants knew or should have known that these representations were false, and they made the representations with the intent or purpose of deceiving Mr. Mirto, their prescribing physicians, and the healthcare industry generally.

172. The J&J Defendants made these false representations with the intent or purpose that Mr. Mirto, their prescribing physicians, and the healthcare industry would rely on them, leading to the widespread use of Levaquin by Mr. Mirto as well as the general public.

173. At all times herein mentioned, neither Mr. Mirto nor his physicians were aware of the falsity or incompleteness of the statements being made by Defendants and believed them to be true. Had they been aware of these facts, Mr. Mirto's physicians would not have prescribed, and Mr. Mirto would not have taken these FLQ drugs.

174.    Mr. Mirto, his prescribing physicians, and the healthcare industry justifiably relied on and/or were induced by the J&J Defendants' misrepresentations and/or active concealment and relied on the absence of information regarding the dangers of FLQ drugs like Levaquin that said Defendants did suppress, conceal, or fail to disclose to Mr. Mirto' detriment. Mr. Mirto justifiably relied, directly or indirectly, on said Defendants' misrepresentations and/or active concealment regarding the true dangers of FLQ drugs.

175.    Based on the nature of the physician-patient relationship, said Defendants had reason to expect that Mr. Mirto would indirectly rely on Defendants' misrepresentations and/or active concealment.

176.    Mr. Mirto reasonable relied upon the J&J Defendants representations and took the Levaquin medications as prescribed by his treating physicians.

### Misrepresentation or Nondisclosure, Whether Negligent or Innocent

177.    The J&J Defendants negligently and/or recklessly misrepresented to Mr. Mirto, his prescribing physicians, and the healthcare industry the safety and effectiveness of FLQ drugs, including Levaquin, and/or recklessly and/or negligently concealed material information, including adverse information, regarding the safety, effectiveness, and dangers posed by such drugs.

178.    The J&J Defendants made reckless or negligent misrepresentations and negligently or recklessly concealed adverse information when they knew, or should have known, that FLQ drugs, including Levaquin, had defects, dangers, and characteristics that were other than what said Defendants had represented to Mr. Mirto, his physicians, and the healthcare industry generally. Specifically, said Defendants negligently or recklessly concealed from Mr. Mirto, their prescribing physicians, the health care industry, and the consuming public that:

a.  Evidence (e.g., Karlman, et al.) of peripheral paresthesia associated with FLQ drug therapy (ciprofloxacin) was known as early as 1988;

b.  Evidence (e.g., Hedenmalm, et al.) demonstrating that FLQ drugs increase the risk of irreversible peripheral neuropathy was known as early as 1996;

c.  It was known in the mid-1990s that cases of paresthesia were one of the three "most frequently reported AEs" related to the central nervous system.

d.  FLQ drugs were not fully and adequately tested by Defendants and/or their predecessor for the risk of developing irreversible neurogenic pain, collagen toxicity, tendinopathy, and aortic disease and other severe side effects;

e.  The severity, frequency, rapid onset, and potentially disabling nature of peripheral neuropathy were known to be caused by FLQ drugs;

f.  The wide range of injuries caused by FLQ drugs to multiple body systems (e.g., musculoskeletal, neuropsychiatric, peripheral nervous system, senses like vision or hearing, skin, and cardiovascular) and aortic disease;

g.  FLQ drugs increased the occurrence of serious events of ruptures or tears in the main artery of the body, called the aorta; that these tears or dissections, or ruptures on an aortic aneurysm can lead to dangerous bleeding or dearth;

h.  The severity, frequency, rapid onset, and potentially disabling nature of collagen toxicity was known to be caused by FLQ drugs and should have been known to increase the risk of aortic disease, including aneurysm and dissection; and

i.  That FLQ drugs should not be used as a first-line therapy for minor or uncomplicated infections.

179.  The negligent or reckless misrepresentations and/or negligent or reckless failures

to disclose were perpetuated directly and/or indirectly by the J&J Defendants.

180.   The J&J Defendants should have known through the exercise of due care that these representations were false, and they made the representations without the exercise of due care leading to the deception of Mr. Mirto, their prescribing physicians, and the healthcare industry.

181.   The J&J Defendants made these false representations without the exercise of due care knowing that it was reasonable and foreseeable that Mr. Mirto, his prescribing physicians, and the healthcare industry would rely on them, leading to the use of Levaquin by Mr. Mirto as well as the general public.

182.   At all times herein mentioned, neither Mr. Mirto nor his physicians were aware of the falsity or incompleteness of the statements being made by the J&J Defendants and believed them to be true. Had Mr. Mirto been aware of said facts, his physicians would not have prescribed, and Mr. Mirto would not have taken Levaquin.

183.   Mr. Mirto justifiably relied on and/or was induced by the J&J Defendants' negligent or reckless misrepresentations and/or negligent or reckless failure to disclose the dangers of Levaquin and relied on the absence of information regarding the dangers of this drug which said Defendants negligently or recklessly suppressed, concealed, or failed to disclose to Mr. Mirto's detriment.

184.   The J&J Defendants had a post-sale duty to warn Mr. Mirto, his prescribing physicians, and the general public about the potential risks and complications associated with Levaquin in a timely manner.

185.   The J&J Defendants made the representations and actively concealed information about the defects and dangers of Levaquin with the absence of due care such that Mr. Mirto's prescribing physicians and the consuming public would rely on such information, or the absence

of information, in selecting these drugs for treatment.

186.    As a result of the negligent or reckless concealment and/or the negligent or reckless failure to provide materials facts as set forth above, Mr. Mirto ingested Levaquin.

### Causation and Damages

187.    As a direct and proximate result of the J&J Defendants' breech of the foregoing product liability claims, Mr. Mirto suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money. The losses are either permanent or continuing and Mr. Mirto will suffer the losses in the future.

WHEREFORE, Mr. Mirto demands judgment for damages against the J&J Defendants, plus interest, costs, and any other relief this Court deems just and appropriate.

### COUNT V – FRAUDULENT CONCEALMENT AGAINST J&J DEFENDANTS

188.    Mr. Mirto re-alleges all prior allegations of paragraphs 1, 4 through 7, 13 through 64 except 26, as if fully set forth herein.

189.    The J&J Defendants concealed their wrongful conduct from the Mr. Mirto with the intent that Mr. Mirto and his prescribing physicians would rely on such material representations as follows:

a.  Defendants had actual knowledge of the defective and dangerous nature of FLQ drugs, including Levaquin;

b.  Defendants failed to conduct adequate testing on their FLQ drugs to establish safety and efficacy.

c.  Defendants had actual knowledge of their misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct.

Yet, said Defendants continued to perpetuate their wrongful conduct with the intent and fixed

purpose of concealing their wrongs from Mr. Mirto and the public at large.

190.   Mr. Mirto and his prescribing physicians were unaware of the falsity of these representations, they acted in actual and justifiable reliance on such material misrepresentations, and Mr. Mirto was injured as a direct and proximate result.

191.   Additionally, the J&J Defendants knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Mr. Mirto, his prescribing physicians, and the general public of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Mr. Mirto and his prescribing physicians would rely on Defendants' misrepresentations.

192.   Mr. Mirto and his prescribing physicians did in fact, act in actual and justifiable reliance on the J&J Defendants' representations.

193.   The J&J Defendants, as the manufacturer and/or distributor of their FLQ drug Levaquin, was in a position of superior knowledge and judgment regarding any potential risks associated with their drug.

194.   Defendants committed constructive fraud by breaching one or more legal or equitable duties owed to Mr. Mirto relating to their FLQ drug Levaquin, said breach or breaches constituting fraud because of its propensity to deceive others or constitute an injury to public interests or public policy.

195.   In breaching their duties to Mr. Mirto, the J&J Defendants used their position of trust as the manufacturer and/or distributor of FLQ drugs to increase sales said drugs at the expense of informing Mr. Mirto that, by ingesting these drugs, he and the general public were placing themselves at a significantly-increased risk of developing irreversible neurogenic pain,

collagen toxicity, tendinopathy, and aortic disease and other severe side effects.

196.    As a direct and proximate result of the J&J Defendants' fraudulent concealment, Mr. Mirto suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money. The losses are either permanent or continuing and Mr. Mirto will suffer the losses in the future.

WHEREFORE, Mr. Mirto demands judgment for damages against the J&J Defendants, plus interest, costs, and any other relief this Court deems just and appropriate.

## COUNT VI – LOSS OF CONSORTIUM AGAINST J&J DEFENDANTS

197.    Mrs. Mirto re-alleges all prior allegations of paragraphs 1, 4 through 7, 13 through 64, and 145 through 221 above, as if fully set forth herein.

198.    As a direct and proximate result of the J&J Defendants' negligence as set forth above, Mrs. Mirto lost the society, services, care, comfort, and consortium of her husband. The losses are either permanent or are continuing in nature and Mrs. Mirto will suffer the losses and impairment in the future.

WHEREFORE, Mrs. Mirto demands judgment for damages against the J&J Defendants, plus interest, costs, and any other relief this Court deems just and appropriate

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial against all Defendants on all matters that concern the determination of any issue of fact.

**Respectfully submitted,**

*/s/ William M. Bloss*
**William M. Bloss**
Bar No.: CT01008
KOSKOFF, KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, CT 06604
(203) 366-4421
bbloss@koskoff.com